## CITIZENS STATE BANK OF CARRIZO SPRINGS v. BRAND, Banking Com'r.

### No. 5132.

Court of Civil Appeals of Texas. Texarkana.

April 22, 1937.

A. J. Lewis, of San Antonio, for plaintiff in error.

Ocie Speer, of Austin, for defendant in error.

JOHNSON, Chief Justice.

The Citizens State Bank of Carrizo Springs, Tex., filed this suit against the Banking Commissioner of the State of Texas, seeking to establish a claim for $3,500 against the Guaranty State Bank of Whitehouse, Tex., a state bank then in the hands of the Banking Commissioner for liquidation. Trial to the court without a jury resulted in judgment denying establishment of plaintiff's claim. Plaintiff has perfected an appeal to this court by writ of error. In addition to the statement of facts, the record contains the findings of facts and conclusions of law of the trial judge.

The material facts are substantially as follows: Neal Butler, witness for plaintiff, testified that he was cashier of plaintiff bank during the times hereinafter mentioned; that on November 6, 1930, J. P. Senter & Co., a produce concern of Whitehouse, Tex., for its convenience in buying produce in and around Carrizo Springs, through its authorized representative, W. L. Hill, opened a checking account with plaintiff bank, by executing and delivering a check in favor of plaintiff bank, drawn on the Guaranty State Bank of Whitehouse, Tex., for $1,000, signed J. P. Senter & Co., by W. L. Hill; that the account of J. P. Senter & Co. was credited with the amount of the check, less customary exchange; that plaintiff bank indorsed the check and sent it through the regular channels for collection; that like transactions, for same amounts, were repeated on November 19 and 22, 1930; that these three checks were all duly paid by the drawee, the Guaranty State Bank of Whitehouse; that like transactions as the above were again repeated on December 4, 6, 8, and 12, 1930; that three of the checks were for $1,000 each, and the fourth was for $500, making a total of $3,500; that these last four checks were not paid. It is for the alleged promise of their payment that liability is sought to be established against the closed Guaranty State Bank of Whitehouse, based upon a telephone conversation had December 13, 1930, between the cashier of the plaintiff bank and the cashier of the closed bank, in which conversation it is claimed that the cashier of the closed bank unconditionally promised to pay the checks. With regard to the conversation the witness Neal Butler testified:

"I was in the bank at Carrizo Springs on the 13th of December, 1930, and I received notice from the National Bank of Commerce, San Antonio, Texas, our San Antonio correspondent, to whom we had sent these checks on their journey to final collection, to the effect that the $1,000.00 check, dated December 4th, had been returned by the Guaranty State Bank of Whitehouse, as unpaid. Being unable to understand the situation, I immediately put in a long distance call for the Guaranty

State Bank of Whitehouse, and I talked with Mr. (A. S.) Langford, who told me he was Vice-president of the bank, and I asked him why the $1,000 draft had not been paid. He told me that the $1,000 check had been received from the Federal Reserve Bank of Dallas, in its regular collection letter and had been in the bank for several days, awaiting returns on some outstanding collection items sent out by the Whitehouse bank for J. P. Senter & Co. and that the $1,000.00 check had been erroneously returned on the 12th of December, the day before our conversation. He also told me that he had one or two of the other drafts there in the bank at that time, which would be taken care of, and also told me to see that the $1,000.00 check which had been returned was again sent to the Whitehouse bank for payment. I then told him that the Citizens State Bank of Carrizo Springs had just the day before taken another check for $500.00, making in all $3,500.00 outstanding; Mr. Langford told me then that there would be no difficulty in the payment of any of the drafts, and I told him then that Mr. Hill was then in Carrizo Springs buying tomatoes, and that I intended to protect the bank if there was any danger whatever in any of the drafts not being paid. Mr. Langford again assured me of the soundness of the deal, and stated unequivocally over the telephone that the Guaranty State Bank of Whitehouse would pay the drafts and so promised me at that time. I asked him to confirm this promise by letter and he promised me that he would do so, however, we never received any letter or other communication from him. Our next advice was on the 16th of December, when we were notified that the bank had closed and that the drafts were being returned unpaid. * * *

"I certainly did rely implicitly on what Mr. Langford told me, and I can safely say that the Citizens State Bank of Carrizo Springs relied upon the promise of Mr. Langford and his bank to pay those checks. I insisted upon Mr. Langford's promise to take care of the drafts and I told him that I would proceed against the concern in every possible way to protect the bank unless I had his asssurance of payment. Mr. Hill was then buying tomatoes and loading them on the railway cars at the time. I told Mr. Langford of this condition and he asked me not to do anything whatever. I relied upon what he said and did not take any action whatever, but permitted Hill to go on and ship out the tomatoes."

On cross-examination the witness testified:

"He told me that the account of J. P. Senter & Company had been insufficient to take care of some drafts that were there, and he said that the expected returns would be in that day and would give the J. P. Senter & Company account sufficient funds to pay all of the drafts.

"Q. Did you request the party with whom you talked at Whitehouse to accept the draft or drafts then in the hands of the Guaranty State Bank of Whitehouse? A. I told the party with whom I talked at Whitehouse on the 13th that I wanted assurance from the bank that not only the drafts then in the Guaranty State Bank would be paid, but the $1,000.00 draft which had been returned the day before as well as the $500.00 draft which was on its way would also be paid by the bank.

"Mr. Langford, as I have already testified, told me that the expected returns that day would be enough to take care of all drafts; I told him to remove all possible doubt and insisted that the bank itself agree to pay the drafts and he agreed to do so, stating that should the expected returns not come in that day, the J. P. Senter & Company were amply able to make satisfactory arrangements for the payment of the drafts, and that they would be taken care of that day.

"Q. Did you ever receive any letter or writing of any character accepting the draft or drafts in controversy, or any of them? A. No, sir."

Witness further testified that shortly after the Guaranty State Bank of Whitehouse closed, J. P. Senter & Co. was adjudged bankrupt; that witness was informed by the referee in bankruptcy that the estate was insolvent and would not pay any dividends, so witness did not file any claim with the referee; and that the Citizens State Bank of Carrizo Springs has not collected anything on the checks or drafts in question.

A. S. Langford, witness for defendant, who was cashier of the Guaranty State Bank of Whitehouse, Tex., at the time it closed, testified as to the telephone conversation in question as follows:

"Well, he (Neal Butler) called me to know why one of the checks had been returned unpaid and in the course of the con-

versation I told him that J. P. Senter & Company has several cars of tomatoes in St. Louis unsold, and that they had two men in St. Louis making an effort to sell those tomatoes and that I expected some money that day out of the proceeds of the sale of the tomatoes, but that they did not have the money in the bank to their credit at that time with which to pay the draft in question, and I could not O. K. it further than to say that they would be paid if they got the money for the tomatoes.

"Q. I will ask you if, at that time, the J. P. Senter Company had in your bank funds sufficient to pay the first draft of a thousand dollars? A. They did not.

"Q. I will ask you whether or not you said to Mr. Butler, if it was Mr. Butler talking over the telephone, that the Guaranty State Bank of Whitehouse would itself pay those drafts or any of them? A. I did not."

Cross-examination:

"Q. Do you say that you did not tell Mr. Butler in that telephone conversation that. the bank would pay those drafts? A. I told him the Guaranty State Bank of Whitehouse would not pay those drafts unless J. P. Senter & Company got funds that day to pay them with.

"Q. Did you tell him that they would have some funds in there to pay them that day? A. No, I told him that the men were in St. Louis trying to sell them and that they expected funds there that day.

"Q. But you did not tell him they would have funds there that day? A. No, no, I did not."

The controlling question in the case is stated by plaintiff in error as follows: "Besides the several attacks on the findings of fact and conclusions of law, as set forth in the pertinent assignments of error, each of which are also submitted as propositions of law, the main proposition of the plaintiff in error is that a promise from one managing official of a bank to another to officially pay a check drawn on the promising bank by one of its customers in a regular banking transaction binds the drawee bank, rendering it (or the Commissioner in the event of liquidation thereof) liable to the holder on such promise in the event of its subsequent breach."

The trial judge from the testimony made the following finding of fact, pertinent to the issue of law here presented: "Langford, on behalf of Guaranty State Bank of Whitehouse, in this conversation, did not, unconditionally, promise that the Whitehouse Bank would pay the drafts. The assurance he gave was based on the coming in of funds to the account of J. P. Senter & Company, or the arrangements which he assured J. P. Senter & Company were able to make so they would be paid."

It is not contended that a conditional promise to pay the checks or drafts, as found by the trial judge, would fix liability on the drawee bank. It is the contention of plaintiff in error that Langford as cashier of the drawee bank unconditionally promised to pay the checks or drafts, and that the finding of the trial judge to the contrary was error. We are not able to say that the finding of the trial judge is without support in the evidence.

However, should it be held that Langford for the drawee bank did unconditionally promise to pay the checks or drafts, no contention is made but that the promise was oral, and under the recent holdings of the Commission of Appeals, adopted by the Supreme Court, no liability against the promising drawee bank would be incurred by reason of such a promise. Kilgore National Bank v. Moore Bros. Lumber Co. (Tex.Com.App.) 102 S.W.(2d) 200, 201, holding: "The plain purpose of these statutes [R.S. art. 5941, § 132] is to prevent any liability to the holder of a check from arising from the bare oral promise of the drawee bank to pay the check. It is equally plain that in the present case liability of the bank to Moore Brothers—whether the transaction from which such liability is claimed to have arisen be called an assignment or anything else—depends entirely on the bare oral promise of the bank to pay the checks. The notation on the bank's ledger which reads, 'Hold for Moore Brothers, $350.00,' adds no force to the bank's promise. In the transaction, the bank made no contract, either orally or otherwise, to pay the amount of the checks to Moore Brothers. It gave its oral promise to pay the checks, but this, standing alone, is insufficient under the statutes to charge the bank with liability."

The judgment of the trial court is affirmed.